2021 IL App (2d) 200388
No. 2-20-0388
Opinion filed May 21, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| JAMAL I. KHOURY and LEDA KHOURY, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | No. 12-CH-4702 |
| | ) | |
| KATHLEEN NIEW, STANLEY NIEW, | ) | |
| and NIEW LEGAL PARTNERS, a/k/a The | ) | |
| Niew Group, | ) | |
| | ) | |
| Defendants | ) | Honorable |
| | ) | Bonnie M. Wheaton, |
| (Stanley Niew, Defendant-Appellant). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court, with opinion.
Justices Zenoff and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal arises from the trial court's grant of summary judgment for plaintiffs, Jamal I.

Khoury and Leda Khoury, and denial of summary judgment for defendant Stanley Niew, who was

an attorney at defendant Niew Legal Partners (Firm). At issue in this appeal is whether Stanley

owed plaintiffs a fiduciary duty with respect to their funds deposited in the Firm's interest on

lawyer trust account (IOLTA). For the reasons stated herein, we reverse.

¶ 2                                    I. BACKGROUND

¶ 3      In 2010, plaintiffs retained then-attorney Kathleen Niew[1] to represent them in the purchase of some real estate. Kathleen and Stanley were officers at the Firm, serving as secretary and president, respectively. They were also married. Plaintiffs transferred money for a real estate purchase into the Firm's IOLTA account, but Kathleen never completed the real estate purchase or returned the funds.

¶ 4      Plaintiffs filed their complaint against Kathleen, Stanley, and the Firm on September 17, 2012, alleging a single count that defendants breached their fiduciary duties to plaintiffs when they removed approximately $2.34 million of plaintiffs' funds from the Firm's IOLTA account without plaintiffs' knowledge or consent and used those funds for their own benefit. Plaintiffs alleged that, in 2010, they had identified a foreclosure property that they could purchase, improve, and then resell for a profit. To retain an attorney for the closing on the foreclosure property, they contacted Kathleen and entered into an attorney-client relationship with her. As to Stanley, they alleged that, by virtue of his marriage to Kathleen and of being her business partner, he was aware of all that Kathleen knew regarding the receipt and misuse of plaintiffs' funds deposited in the Firm's IOLTA account.

¶ 5      Kathleen and the Firm answered the complaint on December 4, 2012. They admitted that Kathleen and the Firm were in a fiduciary relationship with plaintiffs, but they denied that Stanley stood in such a relationship. They denied that they breached their fiduciary duties and denied that plaintiffs were damaged.

¶ 6      Plaintiffs moved for summary judgment on December 14, 2012, and the matter was continued for a hearing on February 19, 2013. Prior to the hearing, counsel for Kathleen and the Firm, Tom Boundas, moved to withdraw, citing difficulties in cooperation and philosophical

---

[1] Kathleen was incorrectly identified as Katherine in the complaint.

differences, and the trial court granted the motion to withdraw. On February 19, 2013, the trial court granted plaintiffs' motion for summary judgment as to all defendants.

¶ 7    New counsel for Kathleen and the Firm filed an appearance on March 6, 2013. That same day, defendants filed a joint motion to vacate the summary judgment order. With respect to Stanley, defendants first argued that Stanley had never been properly served and was not represented by counsel on the summary judgment motion and that therefore the trial court did not have jurisdiction over Stanley. Prior counsel had entered an appearance only for Kathleen and the Firm. Second, they argued that, even if the trial court had jurisdiction over Stanley, plaintiffs failed to set forth facts sufficient to prove that Stanley was liable for a breach of fiduciary duty. With respect to Kathleen and the Firm, they argued that the summary judgment order should be vacated because it was entered only six days after the trial court granted their counsel leave to withdraw, instead of the required 21 days, and because they had raised an affirmative defense and should have been given an opportunity to conduct discovery on their affirmative defense.

¶ 8    On March 14, 2013, the trial court granted in part the joint motion to vacate. It vacated summary judgment as to Stanley but denied the motion as to Kathleen and the Firm.

¶ 9    Stanley moved for summary judgment on March 29, 2013, arguing that his marriage to Kathleen did not make him vicariously liable for her alleged fraudulent conversion and that instead plaintiffs had to provide admissible evidence that he knowingly or recklessly assisted or participated in Kathleen's alleged fraud, which they had failed to do. Stanley also filed his answer and affirmative defenses to the complaint. He answered that he never represented plaintiffs, worked on their legal matters, or had any involvement or control over their funds. He denied owing plaintiffs a fiduciary duty, breaching any duty, and knowing of or benefitting from their funds. He

also alleged an affirmative defense of an independent intervening cause in that a third party removed plaintiffs' funds from the Firm's IOLTA.

¶ 10    On April 1, 2013, the trial court entered judgment against Kathleen and the Firm in the amount of $2,664,809.80 and continued open motions to a later date.

¶ 11    Plaintiffs responded to Stanley's motion for summary judgment on January 21, 2014. Therein, they argued that, under the specific facts of this case, Stanley owed them a fiduciary duty and breached that duty. They argued that a fiduciary relationship can exist apart from an attorney-client relationship. Plaintiffs also responded to Stanley's written interrogatories. They answered in part that, as best as they could recall, they had not spoken with Stanley via telephone or other electronic or written communication and that they were not aware of any specific legal service that Stanley performed on their behalf.

¶ 12    On February 13, 2014, the trial court denied Stanley's motion for summary judgment. On November 19, 2014, the trial court entered an agreed order setting a status pending Kathleen's federal criminal trials and sentencings, and the case was continued multiple times over the next several years. In 2014, Kathleen had pled guilty to wire fraud for misappropriating approximately $2.34 million from plaintiffs, and in 2015, she was sentenced to 70 months' imprisonment. She had been disbarred since 2013.

¶ 13    On March 6, 2020, plaintiffs moved for summary judgment for a second time. Therein, they argued that the undisputed facts showed that Stanley owed them a fiduciary duty to safeguard their funds deposited in the Firm's IOLTA account, he breached that fiduciary duty, and his breach caused them damages. Plaintiffs attached to their motion Stanley's deposition and several other document exhibits related to the Firm. That same day, Stanley filed his second motion for summary

judgment. He attached to his summary judgment motion, *inter alia*, Kathleen's deposition, both of plaintiffs' respective discovery depositions, and his own affidavit.

¶ 14    In Stanley's affidavit, he attested to the following, in relevant part. Plaintiffs were represented by Kathleen, and he never represented or communicated with plaintiffs. He never had control over the funds that plaintiffs entrusted to Kathleen, and he and Kathleen worked in separate areas of law and generally did not represent the same clients. With respect to plaintiffs, he never met with them, and Kathleen did not talk to him about them or their funds. The Firm had an IOLTA account, which his clients used infrequently and only for the deposit of prepaid legal services. The Firm had a bookkeeper for the IOLTA account, who was responsible for administrative work, including providing reconciliation reports for the account. The reports listed only the deposits, not the source, and therefore did not specifically identify plaintiffs' funds. The bookkeeper did not mention plaintiffs' funds to Stanley during the course of Kathleen's representation of plaintiffs. Any transfer of plaintiffs' funds was done without his knowledge, consent, or participation. Prior to February 20, 2013, he did not have any knowledge of plaintiffs' allegations in this case nor any knowledge that Kathleen transferred their funds without their permission.

¶ 15    In Stanley's deposition from June 2013, he testified as follows. He had been an attorney since 1972, and he had been married to Kathleen since 1986. He was currently 72 years old. He and Kathleen first formed a partnership called Niew and Zitzka (Zitzka being Kathleen's maiden name) around 1985 and incorporated as Niew and Associates a few years later. A few years after that, Kathleen left the firm to open her own office in Naperville. About seven or eight years prior to his deposition, he joined Kathleen at her practice, which was the Firm. In joining Kathleen at the Firm, he took with him another attorney, a secretary, and a legal assistant. At the beginning of

2013, the Firm employed approximately seven people, including Stanley and Kathleen. One lawyer left in early 2013 to avoid being "involved with the bad publicity."

¶ 16    Kathleen owned 100 percent of the stock in the Firm; Stanley was never a shareholder. He and Kathleen were the officers, and he had been the president of the Firm. He resigned as an officer in February 2013 because he was angry that he had not known about plaintiffs' lawsuit. He did not learn about plaintiffs' lawsuit until he received a copy of Boundas's motion to that month. Stanley had never had his attorney license suspended, but he had been disciplined once in the 1980s for taking out a marriage license for his marriage to Kathleen while still married to another woman.[2]

¶ 17    Denise Wilson was the Firm's bookkeeper, but she was not a Firm employee; she was an independent contractor who also worked for other firms. Stanley would discuss the IOLTA account with her at least once a month, but he could not recall specifics of their conversations. They generally would discuss the status of what was in the account for his clients, such as whether to return remaining money because work for the client had been completed. They did not discuss any funds in the account other than funds for his clients. As president of the Firm, he did not adopt any written policy for use of IOLTA accounts, but his policy was to follow the rules of professional conduct and the law. He had not spoken to Kathleen about reconciliation reports for the IOLTA account.

¶ 18    In Kathleen's deposition from April 12, 2016, she testified as follows. She was currently in federal prison and was testifying from the prison facility. She had received funds from plaintiffs

---

[2] We note that Kathleen was also censured by the Attorney Registration and Disciplinary Commission because she was married to another man when she and Stanley obtained their marriage license.

and deposited their funds in the Firm's IOLTA account, and she pled guilty to crimes related to the transfer of those funds out of the account. At the Firm, she and Stanley did not have meetings to discuss the status of cases or transactions at the Firm. They would meet every Monday to discuss whether there were any potential conflicts in any Firm cases.

¶ 19    Kathleen first met plaintiffs when a realtor introduced them to her because they were trying to buy a property. Plaintiffs asked her if she could hold money for them and put it into LLCs, which prompted her to suggest transferring the money into the Firm IOLTA account. She suggested deposits of $350,000 at a time. Plaintiffs had lawsuits pending and were worried that the litigation would end up taking their money. Ultimately, they were asking for asset protection. She pled guilty to crimes related to her transfer of plaintiffs' money from the IOLTA account to other entities, including 79th Street Mining. She admitted that she did not have the authority to transfer plaintiffs' funds out of the account.

¶ 20    Kathleen did not have any discussions with Stanley about activity in the Firm's IOLTA account. She did not tell him that she had deposited large checks from plaintiffs, nor did he ever ask her about deposits to or withdrawals from the account. They did not discuss withdrawals from the account, and they did not discuss the entities to which she transferred money from the account. Stanley never asked about the work she was doing for 79th Street Mining. It was not uncommon for large amounts of money to come into the IOLTA account from her clients and then be transferred out, and the account often exceeded half a million dollars. After plaintiffs filed suit against her, she proposed a settlement agreement with them on behalf of herself and Stanley, but she never spoke to Stanley about it before she proposed it, because of "embarrassment."

¶ 21    At her discovery deposition on December 17, 2016, Leda testified as follows. Beyond ledgers showing plaintiffs' money coming into and out of the Firm's IOTLA account, she did not

have any knowledge or evidence that Stanley knew that Kathleen transferred plaintiffs' funds without their authorization. She believed that Stanley knew about and benefited from the unauthorized transfers of plaintiffs' funds, because he was president of the Firm and because he was married to Kathleen. She did not know what benefit Kathleen got from the unauthorized transfers. Leda did not have any evidence that Stanley and Kathleen discussed the money going into or out of the IOLTA account. Plaintiffs never spoke to Stanley via phone or e-mail, and they were never billed by Stanley for any work on their behalf. She could not recall whether Stanley ever performed work to remove liens for plaintiffs, and he never signed anything transferring their funds from the IOLTA account.

¶ 22    Finally, Jamal testified at his January 31, 2020, discovery deposition as follows. He hired Kathleen around 2010 to help close on a foreclosed property. He had no facts or evidence that Stanley worked on that closing, and the closing never occurred.

¶ 23    He interacted with Stanley on at least three occasions. The first time was at the Firm's office. Plaintiffs met him in the hallway, and Kathleen introduced him as her husband. She said that  he specialized in construction or liens and would be helpful in their real estate investment plans by helping remove liens. The introduction lasted a few minutes. The second time he interacted with Stanley was on a visit with Leda to see Kathleen at her office. Stanley saw plaintiffs in the hallway and asked them who they were waiting to see. Jamal responded that they were there to see Kathleen, and Stanley replied that she would be with them shortly and offered them coffee. The third time he saw Stanley was briefly during a meeting with Kathleen to discuss "estate planning." At some point during the meeting, Kathleen left the room to ask Stanley a question about LLCs, and she spoke with him in the hallway for a few minutes. At one point, Stanley stuck his head into the room and said hello.

¶ 24    Jamal had no further interactions with Stanley. They never corresponded by phone, text, or e-mail or communicated in any other way. Jamal had not included the three interactions in his affidavit, because he was "distraught" at the time that it was drafted. He recalled the interactions only later when things calmed down. He conceded that he did not have any personal knowledge or evidence that Stanley performed work on the planned closing for the foreclosed property or that he was aware of the scope of Kathleen's representation of plaintiffs. Jamal did not know whether Stanley was aware of the transfers of plaintiffs' funds into the IOLTA account or whether he would have understood the purpose of those transfers even if he had seen the ledgers of the transfers coming in. He never witnessed or had knowledge of any conversation between Stanley and Kathleen regarding the transferred funds. He had no knowledge or evidence that Kathleen was reporting to Stanley regarding plaintiffs' matters or that Stanley directly supervised Kathleen. He further had no personal knowledge or evidence that Stanley signed off on any of the transfers of plaintiffs' funds, that Stanley was involved in the transfer of funds, or that Kathleen ever told him she withdrew the funds without plaintiffs' authorization.

¶ 25    Jamal agreed that plaintiffs' funds would have been transferred from the IOLTA account to a nonclient of the Firm had the closing on the foreclosed property taken place. Given his agreement on this point, Stanley's attorney asked him why a transfer to a nonclient of the Firm would have raised a red flag for Stanley that the transfer was unauthorized. He responded, "[b]ecause there was no closings [*sic*]." When asked what evidence or facts he had that Stanley was aware that there had been no closing, he answered, "[h]e should have been aware." Jamal did not have any evidence that Stanley actually knew that the closing did not take place. At one point, when asked whether he had any additional knowledge, facts, or evidence that Stanley should be held legally responsible for the unauthorized transfer of plaintiffs' funds from the IOLTA account,

he responded yes, that additional evidence would be disclosed at trial. Upon Stanley's attorney's demand for the immediate procurement of the additional evidence, Jamal's attorney replied that there was no additional evidence.

¶ 26    On June 23, 2020, the trial court granted plaintiffs' motion for summary judgment and denied Stanley's motion for summary judgment. It reasoned as follows. The facts were not in dispute, and the main question was whether Stanley owed plaintiffs a "duty to inquire." Plaintiffs were clearly clients of the Firm, and "every attorney in a firm has a fiduciary duty to the firm's clients." The trial court continued, stating that, "[e]ven in a huge firm with hundreds of attorneys, I believe every attorney has a fiduciary duty to every client of the firm." As evidence of this point, the trial court noted that large firms routinely perform conflicts checks to assure the client the utmost fidelity in anything that would arise. Consequently, the trial court concluded that "it's quite clear that [Stanley] did have a fiduciary duty to [plaintiffs]."

¶ 27    Moreover, the trial court found that, as president of the Firm, Stanley clearly had supervisory authority over Kathleen, who was an employee of the Firm. It cited Rule 5.1 of the Illinois Rules of Professional Conduct of 2010 (Rules) (Ill. R. Prof'l (2010) R. 5.1 (eff. Jan 1, 2010)) as support that Stanley was required to exercise supervisory authority over Kathleen. It emphasized that the Firm was small and that, in addition to being in business together, Stanley and Kathleen were married.

¶ 28    The trial court determined that, contrary to his professional duty, Stanley "exercised no supervisory authority whatsoever over Kathleen." He failed to inquire as to any of her clients, who were not just "her" clients but were clients of the Firm. The trial court found Stanley's failure to supervise "especially egregious" because Kathleen had previously had her attorney license suspended and had been censured. "Because Stanley did not exercise any supervision over

Kathleen and because the safeguarding of client funds requires the highest fiduciary duty per the supreme court," the trial court concluded that Stanley breached his duty to inquire as to the sums of money going in and out of the IOLTA account as part of Kathleen's work at the Firm.

¶ 29    Stanley timely appealed.

¶ 30                                         II. ANALYSIS

¶ 31    At issue in this appeal is whether, in granting summary judgment for plaintiffs, the trial court properly determined that, with respect to plaintiffs' funds deposited in the Firm's IOLTA account, Stanley owed plaintiffs a fiduciary duty. Summary judgment is appropriate when the pleadings, depositions, admissions on file, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018); *Mandigo v. Stolman*, 2019 IL App (2d) 180466, ¶ 15. While parties filing cross-motions for summary judgment agree that only a question of law exists, the mere filing of cross-motions for summary judgment does not necessarily mean that there is no genuine issue of material fact and does not obligate the court to grant one of the motions. *Guterman Partners Energy, LLC v. Bridgeview Bank Group*, 2018 IL App (1st) 172196, ¶ 49. We review *de novo* a grant of summary judgment (*U.S. Bank N.A. v. Gold*, 2019 IL App (2d) 180451, ¶ 7), and we may affirm on any basis in the record (*Brettman v. M&G Truck Brokerage, Inc.*, 2019 IL App (2d) 180236, ¶ 28), although we may not reverse on any grounds found in the record (*People ex rel. Department of Human Rights v. Oakridge Healthcare Center, LLC*, 2020 IL 124753, ¶ 36).

¶ 32    Stanley's argument is threefold: (1) the trial court erred in analyzing whether he owed plaintiffs a fiduciary duty by failing to follow Illinois precedent on when fiduciary relationships are established, (2) it erred in creating a "duty to inquire" based on Rule 5.1 and the fact that

Stanley and Kathleen were married, and, (3) even if the trial court properly determined that he had a duty to inquire, it inappropriately decided disputed questions of fact.

¶ 33    As to plaintiffs' claim that Stanley owed them a fiduciary duty, he argues that they needed to show either that they were in an attorney-client relationship with him or, through clear and convincing evidence, that they placed such trust and confidence in him that he gained influence and superiority over them. He argues that the trial court did not apply either of these standards in finding that he owed plaintiffs a fiduciary duty. He argues further that, even if the trial court had applied the proper standards, the record did not support that either standard was satisfied, because (1) he never represented plaintiffs, worked on their legal matters, or had any involvement in or control over their funds entrusted to Kathleen and (2) they never placed trust or confidence in him and he did not exert any influence over them.

¶ 34    As to the trial court's imposition of a duty to inquire, Stanley argues that it was improper and without basis in law. He contends that the court's reliance on Rule 5.1 was misplaced for at least two reasons: first, obligations under the Rules cannot form the basis for an independent cause of action against an attorney and, second, even if Rule 5.1 provided the relevant standard for a cause of action against an attorney, it required that Stanley have knowledge of the alleged misconduct at a time when the conduct's consequences could be avoided or mitigated. Stanley argues that, while violations of the Rules may be relevant to the standard of care in a malpractice case, no such malpractice claim was alleged here. Moreover, he argues that the record is devoid of any evidence that Stanley knew of Kathleen's unauthorized transfer of plaintiffs' funds.

¶ 35    In addition, Stanley argues that his marriage to Kathleen did not support a duty to inquire. He argues that marital status does not confer knowledge and that there is no legal authority to support the imposition of such a duty based on marital status.

¶ 36 Stanley likewise maintains that the trial court improperly relied on his role as Firm president. In particular, he takes issue with the scope of the court's presumption of supervisory authority, and he asserts that his role as president created duties to the Firm, not to plaintiffs individually. He argues that imposing a duty on a corporation's president to inquire with all of its officers about all actions taken as to all of its clients is unreasonable. He argues that a corporate officer should not be liable for failure to detect fraud based on hindsight. Rather, liability should arise only if the officer knew of facts available at the time of the fraud that should have made the officer aware of the fraud. Stanley argues that, here, the record clearly showed that he had no knowledge at the time of the transfers that Kathleen transferred plaintiffs' funds without authorization.

¶ 37 Furthermore, Stanley contends that the trial court's reliance on Kathleen's history was misplaced. He argues that Kathleen's two prior disciplinary incidents were stale. In 1989, she had been censured for marrying Stanley while still being married to another individual, and, in 2001, she was suspended from the practice of law for nine months for an undisclosed reason. Moreover, he argues that a censure is for violations not serious enough to warrant a sanction prohibiting the practice of law, and a suspension is proper when a corrupt motive or moral turpitude are not clearly shown.

¶ 38 Stanley also argues that, even if he had a duty to inquire, the trial court erred in resolving factual disputes when it found that he had breached his duty. In particular, he argues that the trial court ignored that Stanley met with Wilson once a month to discuss the IOLTA account and that Jamal agreed that, had the closing on the foreclosure property occurred, the transfer of funds from the IOLTA account would not have raised any red flags, even if Stanley had known about the transfers that occurred.

¶ 39    Finally, Stanley argues that affirming the trial court's ruling would create bad public policy. He argues that, under the trial court's ruling, any attorney at a firm would owe all firm clients a fiduciary duty, even those they never represented, met, or interacted with. He asserts that the ruling opens the door to future litigation seeking to hold attorneys individually liable under the standards set forth in the Rules, subverting civil law standards.

¶ 40    Plaintiffs respond that Stanley did owe them a fiduciary duty to safeguard the funds they entrusted to the Firm. They emphasize that the circumstances here warranted the imposition of a fiduciary duty in that Stanley was "President of a two-person, husband and wife law firm." Plaintiffs agree that, generally, a fiduciary relationship exists in the context of a voluntary relationship, such as a power of attorney, or where one gains influence via trust and confidence. They disagree, however, that this case is about the application of those general principles and instead urge us to focus on the specific facts of this case. In particular, plaintiffs emphasize that this case is not simply about performing legal services poorly but instead involves safeguarding client funds deposited in the Firm's IOLTA account.

¶ 41    Plaintiffs argue that, per the supreme court, Stanley had a fiduciary duty as a matter of law with respect to a client's funds entrusted to the Firm. Plaintiffs note that Stanley not only was married to Kathleen but also had access to and utilized the Firm's IOLTA account. Plaintiffs argue that it was not relevant whether Stanley performed legal services for them, spent significant time with them, or worked on their matters. Rather, what was relevant was that, by accepting client funds into the Firm's IOLTA account, Stanley owed plaintiffs a fiduciary duty to safeguard those funds, regardless of whether he or anyone else did work for plaintiffs. In other words, plaintiffs assert that "[t]he duty to safeguard [their] funds arose solely by virtue of the acceptance of those funds for deposit into the Firm's client trust account."

¶ 42    Plaintiffs turn next to the Rules. They first clarify that they are not arguing—and, they assert, the trial court did not find—that a breach of the Rules alone created an independent cause of action. They argue rather that Stanley's alleged violation of the Rules is instructive in deciding whether he breached his fiduciary duty to plaintiffs.

¶ 43    Plaintiffs direct us to Rule 1.15 (Ill. R. Prof'l Conduct (2010) R. 1.15 (eff. July 1, 2015)), regarding the safekeeping of property. They cite comment 1 to Rule 1.15, which begins: "A lawyer should hold property of others with the care required of a professional fiduciary." Ill. R. Prof'l Conduct (2010) R. 1.15 cmt. 1 (eff. Jan. 1, 2010). They argue that the language in Rule 1.15(f) and (g), referring to funds of "clients or third persons held by a lawyer or law firm," indicates that the duty of safekeeping property applies not only to an individual lawyer holding client funds but also to a firm holding the property of clients and nonclients alike. Ill. R. Prof'l Conduct (2010) R. 1.15(f), (g) (Jan. 1, 2010). They argue therefore that Stanley, as president of the Firm and a signatory of the Firm's IOLTA account, had a duty to safeguard plaintiffs' funds even though they were not his clients.

¶ 44    Next, plaintiffs argue that Stanley breached his fiduciary duty to them. They argue that he did nothing to safeguard their funds, such as question the "sudden surge in the volume of activity in the Firm's IOLTA account," question why their funds were transferred to mining companies when the Firm did not have mining companies as clients, ask his wife why the IOLTA account "spiked" with plaintiffs' funds and then rapidly declined, take seriously his conversations with Wilson about IOLTA account activity, or supervise anyone at the Firm. Plaintiffs maintain that the trial court properly considered the totality of the circumstances in reaching its conclusion that Stanley owed them a fiduciary duty, and they emphasize the "extraordinary volume" of their funds that went into and out of the Firm's IOTLA account without any serious inquiry by Stanley. They

also argue that, contrary to Stanley's assertion, there were no issues of material fact for the court to determine.

¶ 45    Finally, plaintiffs argue that Stanley's policy concerns are overblown and hyperbolic, stressing the unique factual scenario presented in this case. They characterize this case as emphasizing the importance for attorneys in management positions at small firms to safeguard client funds.

¶ 46    We hold that the trial court erred in determining that Stanley owed plaintiffs a fiduciary duty. To state a claim for a breach of fiduciary duty, a plaintiff must allege and prove the following: (1) a fiduciary duty exists, (2) the fiduciary duty was breached, and (3) such breach proximately caused the plaintiff's injury. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69. Whether a legal duty exists is a question of law, to be determined by the court. *In re Estate of Powell*, 2014 IL 115997, ¶ 14. A fiduciary relationship may arise as a matter of law (*Van Dyke v. White*, 2019 IL 121452, ¶ 75), such as between attorneys and clients, principals and agents, guardians and wards, and members of a partnership or joint venture (*D'Attomo v. Baumbeck*, 2015 IL App (2d) 140865, ¶ 59). A fiduciary relationship may also arise as a matter of fact when one party places trust and confidence in another and the entrusted party thereby gains influence and superiority over the other party. *Van Dyke*, 2019 IL 121452, ¶ 75. The party asserting a fiduciary relationship as a matter of fact has the burden of establishing the relationship by clear and convincing evidence. *D'Attomo*, 2015 IL App (2d) 140865, ¶ 59.

¶ 47    Plaintiffs do not contend that they had a fiduciary relationship with Stanley as a matter of law based on an attorney-client relationship. This is wise, as the formation of an attorney-client relationship is a consensual relationship in which the attorney must indicate acceptance to work on behalf of the client, and the client must authorize the attorney to work on their behalf. *Wildey*

*v. Paulsen*, 385 Ill. App. 3d 305, 311 (2008). The record shows that plaintiffs and Stanley barely communicated at all, much less demonstrated a consensual relationship for Stanley to work on their behalf. Plaintiffs admit that they never spoke with Stanley via phone, e-mail, or text, and at most Jamal could recall three short interactions, which can be fairly described as small talk. The record does not support that Stanley ever agreed to perform work on their behalf, performed work on their behalf, or billed them for his services.

¶ 48    Nor do plaintiffs contend that they had a fiduciary relationship with Stanley as a matter of fact based on trust and confidence and corresponding influence. To wit, plaintiffs state in their brief:

> "[I]t is not relevant *** whether Defendant performed legal services for the Plaintiffs, or whether Defendant spent significant time with Plaintiffs, or whether Defendant worked on Plaintiffs' matters. What is relevant is that by accepting client funds into the Firm's client trust account, Defendant owed the Plaintiffs a fiduciary duty to safeguard those funds whether he or the Firm [or] Kathleen ever did any work for the Plaintiff [*sic*] or not. The duty to safeguard Plaintiffs' fund arose solely by virtue of the acceptance of those funds for deposit into the Firm's client trust account."

Thus, plaintiffs' sole contention is that Stanley owed them a fiduciary duty as a matter of law to safeguard their funds in the Firm's IOLTA account. They rely on *In re Mulroe*, 2011 IL 111378, ¶ 20, in which the supreme court stated that "the responsibility of holding client funds is a serious fiduciary duty and should not be treated lightly." They also direct us to Rule 1.15 as support that the safeguarding of client funds is of the utmost importance.

¶ 49    Plaintiffs' reliance on *Mulroe* is misplaced. *Mulroe* concerned an appeal from an Attorney Registration and Disciplinary Commission hearing for the respondent attorney's violation of

Rules, including Rule 1.15, related to his holding of client funds. *Id.* ¶¶ 1-3. Thus, the respondent in *Mulroe* is analogous not to Stanley but to Kathleen, who was the attorney that plaintiffs entrusted to hold their funds. Although *Mulroe* asserts the uncontroversial position that the safeguarding of client funds is a serious fiduciary duty, it says nothing about whether an attorney such as Stanley had a duty to safeguard nonclient funds that he did not accept. In fact, attorneys owe a fiduciary duty to nonclients only in the most limited of circumstances. *Felty v. Hartweg*, 169 Ill. App. 3d 406, 408 (1988). The "traditional, general rule [is] that an attorney is liable only to his client, not to third persons." *In re Estate of Powell*, 2014 IL 115997, ¶ 14. A duty may arise if the nonclient was an intended third-party beneficiary of the attorney-client relationship. *Doyle v. Hood*, 2018 IL App (2d) 171041, ¶ 32. Here, plaintiffs point to no attorney-client relationship of Stanley's that was intended to benefit them.

¶ 50    Likewise, Rule 1.15 is not helpful to plaintiffs' argument. Stanley rightly points out that a violation of the Rules does not establish a separate duty or give rise to a cause of action. *Vandenberg v. Brunswick Corp.*, 2017 IL App (1st) 170181, ¶ 34; see Ill. R. Prof'l Conduct (2010) Preamble (eff. Jan 1, 2010) ("Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. *** [The Rules] are not designed to be a basis for civil liability."). Plaintiffs maintain that Rule 1.15 is instructive in that it shows the importance of requiring Stanley to safeguard their funds, however, we disagree.  Rule 1.15 speaks to the safekeeping of property held by lawyers and law firms for both clients and third persons. Importantly here, Stanley was not holding plaintiffs' funds. He did not accept their funds into the IOLTA account. He was not their attorney, and he was not the Firm. Had Stanley agreed to hold plaintiffs' funds as nonclients, this might be a different case, but that is not the situation before us.

¶ 51 Although we owe no deference to the trial court's reasoning on *de novo* review, we briefly address certain problematic aspects of its reasoning. While attorneys clearly owe their clients a fiduciary duty that encompasses obligations of fidelity, honesty, and good faith (*Huang v. Brenson*, 2014 IL App (1st) 123231, ¶ 44), the trial court went too far in reasoning, without qualification, that every attorney at a firm has a fiduciary duty to all the firm's clients. The trial court cited conflicts-of-interest checks to support that all attorneys at a firm owe all firm clients a fiduciary duty. However, comparing conflicts of interest to fiduciary relationships is not comparing apples to apples. As we have stated, the Rules are not meant to create independent legal duties or civil liability for attorneys; they are meant to provide guidance for lawyers and structure for regulating conduct through disciplinary agencies. Ill. R. Prof'l Conduct (2010), Preamble (eff. Jan 1, 2010). Conflicts of interest, which are governed by the Rules, should not be the basis for imposing a fiduciary duty, which carries with it obligations such that, when it is breached, the fiduciary is exposed to civil liability. Moreover, the Rules regarding conflicts of interest seek to prevent interests outside of or apart from the attorney-client relationship from interfering with the attorney's loyalty and independent judgment toward their client (see Ill. R. Prof'l Conduct (2010) R 1.7 cmt. 1 (eff. Jan 1. 2010)), and conflicts of interest may be imputed to other attorneys at the same firm (Ill. R. Prof'l Conduct (2010) R. 1.10 (eff. Jan 1, 2010)). On the other hand, a fiduciary duty imposes affirmative obligations on an individual attorney's representation of their client, and such obligations are not ordinarily imputed to other attorneys at the firm. Put another way, conflicts checks are necessary because any attorney at a firm can create a conflict of interest for a client's attorney, but only that client's attorney ordinarily owes the client a fiduciary duty.

¶ 52    The trial court also cited Rule 5.1 to support Stanley's "duty to inquire." Again, the Rules do not create independent causes of actions against attorneys. Even if we were to look to Rule 5.1 for guidance only, it is not instructive in this case. Rule 5.1 provides, in relevant part:

"A lawyer shall be responsible for another lawyer's violation of the [Rules] if:

\* \* \*

(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, *and knows of the conduct at a time when its consequences can be avoided or mitigated* but fails to take reasonable remedial action." (Emphasis added.) Ill. R. Prof'l Conduct (2010) R 5.1(c)(2) (eff. Jan 1, 2010).

Rule 5.1 would require that Stanley knew of Kathleen's misconduct at a time when it could have been avoided or mitigated. The record demonstrates that he did not have such knowledge. Contrary to plaintiffs' argument and the trial court's reasoning, it is unreasonable to presume that Stanley knew that Kathleen transferred plaintiffs' funds without authorization, simply because he was her husband and the president of their small firm. In fact, it is foolish to presume that one spouse knows what the other is thinking at all times. And while it might be possible for reasonable minds to debate what Stanley as Firm president should have known, Rule 5.1 would require a showing of what he actually knew. Here, the ledgers showing plaintiffs' funds going into and out of the Firm's IOLTA account would not have been evidence of knowledge sufficient to support summary judgment. Jamal admitted that, had the closing occurred, nothing would have been amiss with the transfer of plaintiffs' funds out of the IOLTA account. The only "red flag" was that the closing did not occur, but there was no evidence that Stanley was aware that the closing had been scheduled, much less whether it had occurred, as he never performed any work for plaintiffs or communicated

with them or Kathleen about their matters. The unrebutted testimony was that he and Kathleen largely represented separate clients, practiced in different areas of law, and did not discuss the status of their cases with each other. Thus, to the extent that it would be appropriate to consider the Rules in determining whether Stanley owed plaintiffs a fiduciary duty, Rule 5.1 does not provide any useful guidance.

¶ 53    As a final note, regarding public policy, Stanley's point is well taken that the trial court's ruling, if affirmed, would lead to increased litigation against individual attorneys and leave many attorneys with uncertainty about the scope of their duties toward their firms' client funds. A reversal here does not leave plaintiffs or future litigants without recourse. Plaintiffs have already successfully obtained judgments against Kathleen and the Firm, and similarly wronged future litigants would likewise be able to sue their attorneys and firms for breach of fiduciary duty.

¶ 54    Accordingly, because Stanley did not owe plaintiffs a fiduciary duty, we reverse the trial court's grant of summary judgment for plaintiffs and denial of summary judgment for Stanley. Pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we grant summary judgment in favor of Stanley. We note that our disposition is not intended to speak to any nonfiduciary duties an attorney at a firm may or may not have to nonclients. Plaintiffs' sole count was for breach of fiduciary duty, and all arguments flowed from the allegation that Stanley owed them a fiduciary duty.

¶ 55    Because we hold that Stanley did not owe plaintiffs a fiduciary duty, we need not address whether the trial court improperly resolved factual disputes in finding that he breached the duty.

¶ 56                                    III. CONCLUSION

¶ 57    For the reasons stated, the judgment of the Du Page County circuit court is reversed and summary judgment is granted in favor of defendant Stanley Niew.

¶ 58    Reversed.

---

**No. 2-20-0388**

---

| | |
|---|---|
| **Cite as:** | *Khoury v. Niew*, 2021 IL App (2d) 200388 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 12-CH-4702; the Hon. Bonnie M. Wheaton, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Aaron H. Stanton, Susan M. Horner, and Alex D. Marks, of Burke, Warren, MacKay & Serritella, P.C., of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | William P. Suriano, of Riverside, for appellees. |

---