2022 IL App (1st) 211651-U

FIRST DISTRICT,
FIRST DIVISION
November 14, 2022

No. 1-21-1651

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| GAYLE KALMIN, individually and as trustee of the Gayle's Children's Trust, and, derivatively, as partner of AJW Partnership, an Illinois general partnership, and AC & Associates Partnership, an Illinois general partnership, | ) ) ) ) ) ) | |
| Plaintiff-Appellant, | ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| v. | ) ) | |
| ALVIN J. WEINBERG, individually, as trustee of the Alvin J. Weinberg Revocable Trust and as partner of AJW Partnership, SHARON OBERLANDER, and MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, a Delaware corporation, | ) ) ) ) ) ) | No. 21 L 4778 Honorable Michael F. Otto, Judge Presiding. |
| Defendants | ) ) | |
| (Sharon Oberlander and Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation, | ) ) ) ) | |
| Defendants-Appellees). | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Justices Pucinski and Hyman concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Arbitration clause in contracts was enforceable where (1) plaintiff failed to state a claim that her signature was procured through fraudulent concealment and (2) contracts were properly authenticated.

¶ 2   Plaintiff Gayle Kalmin brought an action for fraudulent concealment, fraud, and breach of fiduciary duty against her father Alvin Weinberg, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), and Sharon Oberlander, a managing director at Merrill Lynch. When Kalmin's mother, Cecile Weinberg, died in 2015, Kalmin "acquired authority over millions of dollars in assets being held in partnership accounts at Merrill Lynch." Kalmin alleged that defendants concealed her authority from her and induced her to sign "a series of virtually blank signature pages" attached to forms giving Alvin "complete and unfettered control over all the substantial assets in the partnership accounts, to [Kalmin's] exclusion."

¶ 3   Merrill Lynch and Oberlander (henceforth, the ML defendants) moved to compel arbitration[1], citing an arbitration provision incorporated into the Merrill Lynch forms bearing Kalmin's signature. The trial court granted their motion, and Kalmin filed an interlocutory appeal under Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). See *Clanton v. Oakbrook Healthcare Center, Ltd.*, 2022 IL App (1st) 210984, ¶ 38 ("An order granting or denying a motion to compel arbitration is injunctive in nature and is appealable under Rule 307(a)(1)." (internal quotation marks omitted)). For the reasons that follow, we affirm.

¶ 4                                   BACKGROUND

¶ 5   Cecile and Alvin created two Illinois partnerships—AJW Partnership ("AJW") in 1979 and AC & Associates ("AC") in 1981—for which they opened Merrill Lynch brokerage accounts holding over $21,000,000 in combined assets. Oberlander was the financial advisor for both partnership accounts.

---

[1] Alvin did not join in the motion to compel arbitration and is not a party to this appeal.

¶ 6        In 2006, Cecile became a co-trustee of twelve trusts (the Weinberg Family Trusts) that each held an ownership interest in either AJW or AC, and Kalmin was named as a successor co-trustee in the event of Cecile's death. When Cecile died in 2015, the successor provision triggered automatically. Kalmin was allegedly unaware of her trusteeship and the fact that it made her a partner in AJW and AC. Alvin was aware but "[a]t no time prior to September 28, 2018 did Alvin notify, inform, or disclose to Kalmin her co-trusteeship of the Weinberg Family Trusts or the consequences thereof." In March or April 2016, Kalmin told Oberlander that Alvin refused to increase the quarterly trust distributions and asked Oberlander to "talk to Alvin about it." Based on this conversation, "it was obvious that Kalmin did not know that she and her co-trustees, not Alvin, were empowered to make decisions about trust distributions."

¶ 7        On May 11, 2016, Alvin, who was administering Cecile's estate, requested Kalmin's signature on five pages. Each page was titled "WCMA Account Application" with a bolded header "III. ENTITY AUTHORIZATION FORM (continued)" and a footer "Page 8 | Authorization Form for Partnerships." There was a space labeled "General Partner Name (Individual or Entity)," in which one of the Weinberg Family Trusts is printed, and a space labeled "Print Name and Title (If General Partner is an Entity)," in which "Gayle Kalmin, TTEE" is printed. Each page stated that "[a]ll General Partners must sign." Since Kalmin "trusted her father" and "had no reason to believe [he] would deceive her," she signed the pages without requesting or reviewing the remaining pages of the forms.

¶ 8        On May 16, 2016, Alvin faxed the signed pages to Oberlander, who attached them to the remaining pages of the forms (henceforth, the WCMA forms[2]) designating Alvin as an authorized representative of the partnership accounts, with exclusive powers as "Agreement

_____

[2] WCMA stands for Working Capital Management Account.

Signer," "Check Signer," and authority over "Fund/Security Distribution" and "Trade." In effect, the forms "give Alvin complete, exclusive, and unfettered control over the Partnership Accounts, to [Kalmin's] exclusion." Kalmin alleged that Alvin "conceal[ed] from [Kalmin] the nature, meaning, and purpose" of the forms, as well as the fact that "without [Kalmin's] signature, Alvin had no authority whatsoever over the Partnership Accounts."

¶ 9        Kalmin first realized she was a trustee of the Weinberg Family Trusts on September 28, 2018, when Alvin requested her signature on a form entitled "Designation of Successor Trustees" that sought to replace Kalmin and her co-trustees with Alvin's friend Mark Slutsky. Kalmin refused to sign and began "to gather and review documents and information relating to the Weinberg Family Trusts and the AC and AJW Partnerships." On July 25, 2019, one of Oberlander's team members faxed Kalmin the completed WCMA forms bearing her signature, at which time Kalmin "realize[d] what had transpired in May 2016."

¶ 10       On May 21, 2021, Kalmin filed her complaint *pro se*, bringing claims for fraudulent concealment, fraud, and breach of fiduciary duty against Alvin and the ML defendants.[3] In count I (fraudulent concealment), Kalmin alleged that the ML defendants concealed the fact that she was a trustee of the Weinberg Family Trusts and a majority partner in AJW and AC, with the intent "to induce [Kalmin] into falsely believing that she was not a co-trustee of the Weinberg Family trusts, that she had no authority over any of the Partnership Assets, and that Alvin had such authority." Had this information not been concealed from her, Kalmin would not have unknowingly relinquished her authority over the partnership accounts to Alvin or anyone else.

¶ 11       In count III (fraud), Kalmin alleged that the ML defendants' failure to inform her of her trusteeship and her authority over the partnership accounts "constitutes the making of a false

---

[3] Counts II, IV, and VI are against Alvin and are not relevant to this appeal.

statement of material fact," and she reasonably relied on the ML defendants' silence "as a representation that [she] was not a co-trustee of the Weinberg Family Trusts and lacked any authority whatsoever over the Partnership Assets."

¶ 12    In count V (breach of fiduciary duty), Kalmin alleged that the ML defendants owed a fiduciary duty to AJW, AC, and their respective partners, including Kalmin. As a factual basis for her claim of fiduciary duty, Kalmin alleged that:

- For "10-15 years," Oberlander "served as the sole financial manager to Alvin and Cecile, both individually, and in their respective capacities as partners of AJW and AC."

- Oberlander "cultivated a years-long close and personal relationship with Alvin and Cecile" and attended various social events with them, including New Year's Day parties, events at the Chicago Opera House, and Kalmin's wedding.

- "At some time prior to August 20, 2015, [Oberlander] also became the personal financial advisor for [Kalmin] and her husband, Fred Kalmin."

¶ 13    Kalmin alleged that the ML defendants breached their fiduciary duty to her by not disclosing her trusteeship and failing to contact her about the management of the AJW and AC accounts. Kalmin further alleged that the ML defendants:

"l. Allowed ALVIN, a non-trustee, to misappropriate the Partnership Assets, which had been entrusted to them, as fiduciaries, although they had actual knowledge of sufficient facts to show the 'signed' WCMA Forms were obtained through fraudulent means and not legitimate;

m. Unreasonably rel[ied] upon the 'signed' Signature Pages or WCMA Forms that ALVIN provided to them on or about May 16, 2016 ***.

***

p. Continue[] to rely upon the legitimacy of the WCMA Forms in bad faith.”

¶ 14      Kalmin sought compensatory damages, costs of bringing the action, and a declaration that “the 'signed' WCMA forms [are] void *ab initio* and of no force and effect.”

¶ 15      The ML defendants moved to compel arbitration based on the WCMA forms signed by Kalmin on May 16, 2016, which stated on page 7 that

“the partnership has received a copy of the WCMA Financial Service Account Agreement and Program Description Booklet (the 'Agreement') and agrees to the terms and conditions contained therein; *** [and] that, in accordance with section 17, page 18, of the Agreement, the partnership is agreeing in advance to arbitrate any controversies that may arise with Merrill Lynch.”

¶ 16      The WCMA Financial Service Account Agreement and Program Description Booklet (“Account Agreement”) incorporated by reference into the WCMA forms provides:

“This Agreement contains a predispute arbitration clause. By signing an arbitration agreement, the parties agree as follows:

• All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.

***

You agree that all controversies that may arise between us shall be determined by arbitration.”

¶ 17      The ML defendants argued that New York law governed the question of whether the parties agreed to arbitrate, per a choice-of-law provision in the WCMA forms, and, under New York law, Kalmin was bound by the arbitration agreement notwithstanding her alleged failure to

read the documents that she executed. They also argued that "[t]he Partnership Accounts have always been governed by a mandatory arbitration provision," referencing the WCMA Account Agreement for the AJW partnership account and the account opening documents for the AC partnership account.

¶ 18    Kalmin opposed the motion to compel arbitration, arguing that she did not enter into an arbitration agreement because she was only provided with signature pages that did not mention arbitration or indicate that she was entering into a contract with Merrill Lynch. In the alternative, she argued that enforcing the arbitration agreement would be procedurally unconscionable since she was not aware of her trusteeship and "was deceived by her father into signing signature pages that did not contain an arbitration clause [or] Merrill's name."

¶ 19    On December 9, 2021, the trial court granted the motion to compel. The court found that although Kalmin was provided only the signature pages of the WCMA forms, those pages "clearly indicate[]" that they are the eighth page of a document, and "[i]f the plaintiff did not wish to enter into a contract or wished to review the contract before affixing her signature to it, thereby evidencing her assent to its term[s], she could have easily withheld that signature until she were provided a contract." The court additionally found it significant that the motion to compel was brought solely by the ML defendants and not Alvin, stating:

> "Whether the contract might be enforceable or not as between plaintiff and [Alvin] is a question the court is not called upon to decide today and does not decide. But as to Merrill Lynch, they were entitled to rely on that signature. This was a contract that included a clear and conspicuous arbitration clause. And there is no question in the court's mind that the contract was entered into."

¶ 20                                ANALYSIS

¶ 21        A motion to compel arbitration "is essentially a section 2-619(a)(9) motion to dismiss or stay an action in the trial court based on an affirmative matter" (*Sturgill v. Santander Consumer USA, Inc.*, 2016 IL App (5th) 140380, ¶ 21; see 735 ILCS 5/2-619(a)(9) (West 2018)), which admits all well-pleaded allegations in the complaint as true. *Doe v. University of Chicago Medical Center*, 2015 IL App (1st) 133735, ¶ 4. Since the court granted the motion without an evidentiary hearing, our review is *de novo*. *Hollingshead v. A.G. Edwards & Sons, Inc.*, 396 Ill. App. 3d 1095, 1099 (2009).

¶ 22        Under the Federal Arbitration Act ("FAA"), a "written provision in *** a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction *** shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; see *Board of Managers of Courtyards at Woodlands Condominium Ass'n v. IKO Chicago, Inc.*, 183 Ill. 2d 66, 74 (1998) ("once a contract containing a valid arbitration clause has been executed, the parties are irrevocably committed to arbitrate all disputes arising under the agreement"). However, "there is no arbitration without a valid contract to arbitrate." (Internal quotation marks omitted.) *Tortoriello v. Gerald Nissan of North Aurora, Inc.*, 379 Ill. App. 3d 214, 226 (2008). "The party seeking to compel arbitration has the burden to establish that the parties have a valid agreement to arbitrate and that the controversy falls within the scope of the arbitration provision." *Sturgill*, 2016 IL App (5th) 140380, ¶ 16.

¶ 23                               Choice of Law

¶ 24        Initially, the ML defendants argue that New York law is controlling due to a choice-of-law provision in the WCMA forms. "A contract's choice-of-law provision may not apply if the

contract's legality is fairly in doubt, for example, if the contract is unconscionable, or if there is some other issue as to the validity of the very formation of the contract." *Life Plans, Inc. v. Security Life of Denver Insurance Co.*, 800 F.3d 343, 357 (7th Cir. 2015). Since the validity of the WCMA forms is a central disputed issue, applying the choice-of-law provision "would presume the applicability of a provision before its adoption by the parties has been established." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) (citing *B–S Steel of Kansas, Inc. v. Texas Industries, Inc.*, 439 F.3d 653, 661 n. 9 (10th Cir. 2006) (referring to "the logical flaw inherent in applying a contractual choice of law provision before determining whether the underlying contract is valid")). In the absence of the choice-of-law provision, Illinois law provides that "the validity, construction and obligations of a contract are governed by the law of the place where it is made." *Progressive Insurance Co. v. Williams*, 379 Ill. App. 3d 541, 546 (2008). Thus, we apply Illinois law in reviewing the trial court's decision to grant the motion to compel arbitration.

¶ 25                          Whether a Valid Arbitration Agreement Was Formed

¶ 26        Kalmin argues that the ML defendants have not met their burden of showing the parties have a valid agreement to arbitrate because there was no mutual assent regarding the terms of any contract. Alternately, she argues the WCMA forms are void because defendants procured her signature through fraud.

¶ 27        For a contract to be enforceable, there must be mutual assent as to its terms. *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 20. "[H]owever, it is not necessary that the parties share the same subjective understanding as to the terms of the contract. [Citation.] It suffices that the conduct of the contracting parties indicates an agreement to the terms of the alleged contract." (Internal quotation marks omitted.) *Midland Hotel Corp. v.*

*Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 313-14 (1987). Such agreement is most commonly shown by signing a contract. *Arbogast*, 2021 IL App (1st) 210526, ¶ 21. It is a "maxim of contract law that a party to an agreement is charged with knowledge of and assent to the agreement signed." *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 150 (2006). As this court has stated:

> "[T]he contract cannot be avoided by proof that one of the parties, if he was sound in mind and able to read, did not know the terms of the agreement. One must observe what he has reasonable opportunity for knowing ***. A person is presumed to know those things which reasonable diligence on his part would bring to his attention." (Internal quotation marks omitted.) *Bunge Corp. v. Williams*, 45 Ill. App. 3d 359, 364-65 (1977) (arbitration clause printed on back of contract was enforceable despite defendants' allegation that they never read the clause, since the front contained a bolded notice that additional terms were on the back).

¶ 28    Here, Kalmin acknowledges signing the signature pages provided by her father, but argues that her signature is insufficient to show assent because she was not given the remaining pages of the forms and was not aware she was executing a contract with Merrill Lynch. She claims the signature pages were "not obviously contractual in nature." We disagree. Each page was titled "WCMA Account Application" and bore the header "III. ENTITY AUTHORIZATION FORM (continued)" and the footer "Page 8 | Authorization Form for Partnerships." It was apparent on the face of the pages Kalmin signed that she was authorizing something related to partnerships and/or other entities and that there were seven other pages of terms to which she was lending her assent. Under these circumstances, Kalmin's failure to read the remaining pages does not negate her assent to those terms. *Melena*, 219 Ill. 2d at 150; see

*Navistar Financial Corp. v. Curry Ice & Coal, Inc.*, 2016 IL App (4th) 150419, ¶ 39-45 (enforcing contract despite defendant's claim that signatory was only provided with a signature page).

¶ 29    Kalmin next argues that the WCMA forms are void because the ML defendants procured her signature through fraudulent inducement. This argument is forfeited since Kalmin failed to raise it in response to the ML defendants' motion to compel. See *Kane v. Option Care Enterprises*, 2021 IL App (1st) 200666, ¶ 33 ("Arguments that have not been raised in the trial court are forfeited and cannot be raised for the first time on appeal").

¶ 30    Even if we overlook Kalmin's forfeiture (see *People v. $8,450 U.S. Currency*, 276 Ill. App. 3d 952, 954 (1995) (forfeiture rule is an admonition to the parties, not a restriction on our jurisdiction)), her argument fares no better on its merits. "[I]f [a party's] signature is secured by some fraudulent trick or device as to the context of the contract, which prevents him from reading the agreement, he may by proper action avoid the contract." (Internal quotation marks omitted.) *Bunge*, 45 Ill. App. 3d at 364. Such fraudulent inducement is a form of common-law fraud, the elements of which are "(1) a false statement of material fact; (2) knowledge or belief by the defendant that the statement was false; (3) an intention to induce the plaintiff to act; (4) reasonable reliance upon the truth of the statement by the plaintiff; and (5) damage to the plaintiff resulting from this reliance." *Avon Hardware Co. v. Ace Hardware Corp.*, 2013 IL App (1st) 130750, ¶ 15.

¶ 31    Kalmin does not allege any false statements of material fact made by the ML defendants. Instead, she argues that they were her fiduciaries and had an affirmative duty to inform her of her trusteeship and the consequences of signing the WCMA forms. A fiduciary relationship exists where "one party reposes special trust and confidence in another[,] who accepts that trust and

confidence and thereby gains superiority and influence over the subservient party." (Internal quotation marks omitted.) *Tummelson v. White*, 2015 IL App (4th) 150151, ¶ 21. In such a relationship, the dominant party has a duty to act for the benefit of the subservient party on matters within the scope of the relationship (*In re Estate of Baumgarten*, 2012 IL App (1st) 112155, ¶ 17) and must disclose all material facts to the subservient party (*Guvenoz v. Target Corp.*, 2015 IL App (1st) 133940, ¶ 107). Concealment of such facts constitutes fraud "if done with the intention to deceive under circumstances creating an opportunity and duty to speak." (Internal quotation marks omitted.) *Guvenoz*, 2015 IL App (1st) 133940, ¶ 107.

¶ 32        Here, Kalmin did not allege sufficient facts to state a claim that the ML defendants had a fiduciary duty to inform her of her trusteeship or the consequences of signing the WCMA forms. Since an agent's fiduciary duty is limited to actions taken within the scope of her agency, "[t]he duty of care owed by a broker carrying a nondiscretionary account for a customer is an exceedingly narrow one, consisting at most of a duty to properly carry out transactions ordered by the customer." *Index Futures Group, Inc. v. Ross*, 199 Ill. App. 3d 468, 475-76 (1990); see also *First American Discount Corp. v. Jacobs*, 324 Ill. App. 3d 997, 1012 (2001) (same). As a factual basis for her claim of fiduciary duty, Kalmin alleges that Oberlander managed funds for her, her husband Fred, Alvin, and Cecile, and attended social events with them. Taking these allegations as true (see *Doe*, 2015 IL App (1st) 133735, ¶ 4), they do not support the imposition of a fiduciary duty on the ML defendants. See *Khoury v. Niew*, 2021 IL App (2d) 200388, ¶ 46 ("Whether a legal duty exists is a question of law, to be determined by the court").

¶ 33        Kalmin argues the present case is analogous to *Janowiak v. Tiesi*, 402 Ill. App. 3d 997 (2010), in which we found a material issue of fact as to whether a trustee procured a release from a beneficiary through fraudulent inducement. *Id.* at 1017. Kalmin's reliance on *Janowiak* is

misplaced because that case involved a fiduciary relationship between trustee and beneficiary (*id.* at 1006), which is not at issue here.

¶ 34    Accordingly, the ML defendants have met their burden of showing a valid arbitration agreement exists between them and Kalmin. In reaching this conclusion, we note that, as the trial court stated, "Whether the contract might be enforceable or not as between plaintiff and [Alvin] is a question the court is not called upon to decide today and does not decide. But as to Merrill Lynch, they were entitled to rely on that signature."

¶ 35                                Admissibility of the WCMA Forms

¶ 36    Kalmin argues that the trial court erred in considering the WCMA forms submitted by the ML defendants in support of their motion to compel arbitration because the forms were not properly authenticated.

¶ 37    The ML defendants filed their initial motion to compel on July 19, 2021. In support, they attached copies of the WCMA forms executed by Kalmin, as well as the Account Agreement Booklet incorporated by reference into the WCMA forms. They also attached the affidavit of Shirley Williams, a market supervision manager for Merrill Lynch. Williams stated that she is familiar with WCMA forms and, in particular, with the WCMA forms executed by Kalmin. She stated that the attached WCMA forms were "true and accurate copies," and the attached Account Agreement Booklet is given to account holders "[i]n the ordinary and regular course of the business" of Merrill Lynch. Said documents "have been duly maintained in the files of [Merrill Lynch] in the ordinary and regular course of its business."

¶ 38    On October 22, 2021, the ML defendants moved for leave to file a corrected motion to compel arbitration, stating that in attaching the copies of the WCMA forms to its initial motion, "the attorneys preparing the exhibits *** mistakenly used the exhibits from Plaintiff's complaint

rather than pulling the copies from the documents that had been provided to [counsel's] office by [Merrill Lynch]." Due to this "honest mistake," the ML defendants sought leave to file amended exhibits that were "substantively identical," as well as a supplemental affidavit by Williams stating that the amended exhibits were true and accurate. The trial court granted the ML defendants' motion.

¶ 39    In Williams' deposition, she testified that Merrill Lynch client documents are stored in the Client Documents Online System (CDOL) by investor account number. Someone from Merrill Lynch's legal department retrieved and compiled the documents attached to her second affidavit. Williams then reviewed the documents and compared them page-by-page to the documents in CDOL to verify their completeness and accuracy. She admitted not performing the same page-by-page review for the documents attached to her first affidavit. She also admitted she did not witness Kalmin signing the forms and did not have any knowledge as to whether Kalmin was provided the forms in their entirety.

¶ 40    Rule 191(a) provides that affidavits submitted in support of a section 2-619 motion to dismiss "shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013). For a document to be admissible, the proponent must present evidence "to demonstrate that the document is what its proponent claims it to be." *Anderson v. Human Rights Comm'n*, 314 Ill. App. 3d 35, 42 (2000). This is typically done "through the testimony of a witness who has sufficient personal knowledge to satisfy the trial court that a particular item is, in fact, what its proponent claims it to be." (Internal quotation marks omitted.) *CCP Ltd. Partnership v. First Source Financial, Inc.*, 368 Ill. App. 3d 476, 484 (2006).

¶ 41     Here, the ML defendants properly laid a foundation for the introduction of the WCMA forms through Williams' supplemental affidavit and deposition testimony. Although Williams did not compile the amended exhibits herself, she reviewed them and verified their completeness and accuracy by comparing them page-by-page with Merrill Lynch's digital client records. Thus, she has sufficient knowledge to aver that they are what they claim to be, *i.e.*, the WCMA forms that Kalmin signed on May 16, 2016.

¶ 42     Kalmin argues that Williams' testimony is insufficient to authenticate the forms because she "has no personal or independent knowledge as to how [Kalmin's] signature was obtained." However, Kalmin acknowledges signing the signature pages in her complaint and gives a detailed account as to how her signature was obtained, which we take as true in reviewing the grant of a section 2-619 motion (*Doe*, 2015 IL App (1st) 133735, ¶ 4). Indeed, she admits in her brief that "there is no dispute as to the authenticity of the signature pages themselves." Kalmin's admissions, combined with Williams' testimony as to how she verified the integrity of the WCMA forms within the CDOL system, are sufficient to authenticate the WCMA forms.

¶ 43                                        CONCLUSION

¶ 44     For the foregoing reasons, we affirm the trial court's order granting the ML defendants' motion to compel arbitration.

¶ 45     Affirmed.